STATE ex rel. SHORT, Atty. Gen., et al. v. RIEDELL et al.

No. 14898—Opinion Filed Oct. 21, 1924.

Rehearing Denied March 17, 1925.

## Licenses—Accountancy Act—Unconstitutional Provisions.

House Bill No. 204, Session Laws of 1917, known as the Accountancy Act (art. 10, chap. 87, Comp. Stat. 1921), in so far as it prohibits uncertified accountants from holding themselves out as professional or expert accountants or auditors for compensation or engaging in the practice of that profession, is in conflict with the spirit and express provision of the Constitution and void. in this, that it abridges the right of private property, and infringes upon the right of contract in matters purely of private concern bearing no perceptible relation to the general or public welfare, and thereby tends to create a monopoly in the profession of accountancy for the benefit of certified accountants, and denies to uncertified accountants the equal protection of the laws and the enjoyment of the gains of their own industry.

(Syllabus by Ray, C.)

Commissioners' Opinion, Division No. 1.

Error from District Court, Oklahoma County; George W. Clark, Judge.

Action by the State of Oklahoma, ex rel. George F. Short, Attorney General, and George F. Short, Fred Parkinson, and Tom D. Boydston, as the State Board of Accountancy, against Charles M. Riedell, A. D. Strandberg, and Charles M. Riedell & Co., a copartnership composed of Charles M. Riedell and A. D. Strandberg, copartners. Judgment for defendants, and plaintiff appeals. Affirmed.

George F. Short, Atty. Gen., M. W. McKenzie, Asst. Atty. Gen. and Hunter L. Johnson, for plaintiff in error.

Selby & Callihan and H. A. Kroeger, for defendants in error.

Opinion by RAY, C. This action in the nature of quo warranto was commenced in the district court of Oklahoma county by the State, on the relation of the Attorney General and the State Board of Accountancy, to oust the defendants from the exercise of what is termed as a franchise, that is, the holding themselves out to the public, and practicing, as professional or expert public accountants and auditors for compensation, without having first appeared before the State Board of Accountancy and stood an examination and received a certificate from that board authorizing them to engage in that business as professional accountants.

The defendants are not, and have not been, practicing their profession for the state or any of its subdivisions or municipalities, but have been, and are, holding themselves to practice their profession for compensation for individuals, firms, and corporations, other than the state or its subdivisions, who may desire their services.

It is the contention of the defendants that the Public Accountancy Act does not by its terms prohibit the exercise of that profession by uncertified accountants, but, if so, then that act, insofar as it seeks to prohibit the practice of that profession without having received the certificate there provided for, is unconstitutional and void for the following reasons: That it deprives the defendants of their liberty and property. without due process of law; that it deprives them of their inherent right to liberty, the pursuit of happiness, and enjoyment of the gains of their own industry; that it denies, impairs. and disparages the inherent rights of the defendants to contract in matters of private concern, and in which the public at large and the public welfare, peace, health, and safety are not concerned or involved; that the act is violative of the Bill of Rights in that, in effect, it attempts to create, and does create, a monopoly in the business of auditing and accounting; that it attempts to create an association of accountants and auditors to individuals, and to grant thereto individual and exclusive

rights, privileges, and immunities; that it contravenes the spirit of the Constitution in that it purports to grant certain arbitrary power and authority to the State Board of Accountancy, and lodges with that board an unlimited discretionary power to permit certain of the citizens of the state to engage in the business of auditing and accounting to the exclusion of others, and seeks to delegate an assumed power of the Legislature to the Board of Accountancy to establish rules and regulations, and to arbitrarily make additional requirements to those required by the statute, and thereby to discriminate against one citizen of the state in favor of others; that it is an unlawful attempt upon the part of the state to ex- cise police power concerning a matter which in no way affects the public peace, health, safety, or general welfare, and without any public necessity therefor. It is contended on the part of the state that the act prohibits the practice of the profession of auditing and accounting by one not having first stood the examination before the Board of Accountancy and received a certificate of qualifications to practice as a professional accountant, and that the enactment of the law complained of by the defendants was a legitimate, valid, and proper exercise of the police power of the state, and not violative of the Constitution or any of its provisions.

It is conceded by the defendants that the Accountancy Act, insofar as it requires an examination before the Board of Accountancy and the issuance of a certificate of qualifications for those practicing or intending to practice the profession of auditing and accounting for the state, or its officers, or any subdivisions of the state or their officers, and insofar as it creates degrees of accountancy and provides for the issuance of certificates of qualifications to practice as professional auditors and accountants, is within the police power of the state and valid, but they contend that it is invalid insofar as it seeks to prohibit accountants who have not stood the examination before the state board and received a certificate authorizing them to follow that profession as accountants for individuals, firms, and corporations desiring to employ them. In other words, the defendants contend that in following their profession as accountants for private individuals, firms, and corporations, and not for the state or any of its subdivisions or municipalities, they are not exercising a franchise, but are exercising a right guaranteed to them by the federal and state Constitutions.

The Accountancy Act is House Bill No. 204, Session Laws of 1917, chap. 87, art. 10,

Comp. Stat. 1921. The sections complained of are sections 11 and 14 of the original act (sections 10922 to 10937, Comp. Stat. 1921). Section 1 of the act creates a State Board of Accountancy to be composed of the State Examiner and Inspector, the Attorney General, and one member to be appointed by the Governor, who shall have had at least three years practical experience as a public accountant. Section 4 authorizes the board to administer oaths to applicants, to conduct investigations and examinations, to determine the qualifications of applicants, to confer the degrees of (a) Certified Commercial Accountant, (b) Certified Municipal Accountant, (c) Certified Public Accountant, and to establish rules and regulations requisite to properly carrying out the purposes of the act. Section 5 provides that examinations of applicants shall be held at the state capitol twice each year, the examination to be oral or written, at the discretion of the board. Section 6 designates the subjects upon which applicants must stand a satisfactory examination to entitle them to the degrees of Certified Commercial Accountant and Certified Municipal Accountant and authorizes the board to add such other subjects as it may deem appropriate and necessary. When the applicant has had the degrees of Certified Commercial Accountant and Certified Municipal Accountant conferred, the board is required to confer upon such applicant the degree of Certified Public Accountant. By section 7 it is provided that any citizen of the United States over the age of 21 years, of good moral character, who has passed a satisfactory examination, shall receive a certificate of his qualifications to practice as a professional accountant. Section 9 confers the power upon the board to revoke any certificate, upon hearing, upon any of the following grounds: For conviction of a felony; for conviction of conduct involving moral turpitude; for certifying to a false or fraudulent statement in relation to an audit, or for fraud or misrepresentations in application for certificate. By section 12 the applicants are required to deposit $25 at the time of filing their applications, which shall not in any event be returned. These fees are required to be paid to the State Treasurer. The expenses incident to the examinations and per diem of the appointive member of the board are required to be paid from the contingent fund of the State Examiner and Inspector, not to exceed in any event the amount of the fees collected and covered into the treasury under the act. Section 15 makes it a misdemeanor for anyone to falsely hold himself out as

having received a degree. Sections 11 and 14, in effect, make it unlawful for one not a holder of a certificate to engage in that profession for compensation. Section 11 defines "expert accountant" as "a person skilled in the knowledge and science of accounting and who is the holder of a 'Certified Public Accountant' certificate issued in pursuance of the provisions of this act." Section 14 makes it unlawful for one not certified as a professional accountant under the provisions of the act to hold himself out as a public or expert accountant or auditor for compensation.

As to the defendants' first contention, we deem it unnecessary to say more than that, after a careful consideration of the act as a whole, we think it was clearly the legislative intent to prohibit anyone engaging in the practice of the profession of accountancy who has not stood the examination and received the certificate as provided by that act.

It is agreed by counsel that every state in the Union has a law regulating accountancy similar to the law of this state, with the exception that, at the time this action was commenced, no other state had attempted to prohibit the practice of the profession by those not certified.

The validity of the statutes regulating accountancy has been upheld as being within the police power of the state by the courts of Alabama, Louisiana, New York, and Texas. In all of the cases holding the act within the police power of the state, where its validity was questioned, the courts have particularly pointed out that the regulations did not prohibit one not holding the certificate to practice the profession of accountancy.

In Lehmann v. State Board of Public Accountancy (Ala.) 94 South. 94, where the State Board of Accountancy sought to cancel a certificate issued to one of its members. where it was held that the act was within the police power of the state and valid, the court said:

"The rights of complainant in this case are unlike the rights of a physician, surgeon, dentist, lawyer, or school-teacher to practice their callings or professions. Under the law, they cannot practice without a certificate or license; and, when their license or certificate is revoked, they are thereby prevented from practicing their profession at all. In the case of accountants, however, this is not true. They are not required to obtain a certificate or license to practice their calling, but obtaining the license or certificate is purely voluntary on their part. Nor does the revocation or cancellation of

the license or certificate, when once issued, bar or deprive them from further or longer practicing their chosen calling. The license in their case is but a certificate of the board issuing it as to their competency and fitness. It is not at all a requisite to the practice of their calling, though it may be true, and, doubtless is, that the certificate of license, being an authoritative recommendation or certification of a legally constituted board as to efficiency and qualifications, has some value."

In State v. DeVerges (La.) 95 South. 805, the defendant was being prosecuted for holding himself out to the public as a certified public accountant and using the initials "C. P. A." without first having obtained the certificate required by the statute. His defense was that he was a certified public accountant and authorized to use the initials "C. P. A." by reason of that degree having been conferred upon him by the National Association of Public Accountants, and also the invalidity of the accountancy act. In the opinion sustaining the act the court said:

"It is important to note that the law does not purport to prevent or punish the practicing of accountancy without a license or certificate from the board, but only the holding of one's self out to the public as possessing the certificate which it is authorized to issue under the provisions of the act, the practicing as a certified public accountant, and the using of the abbreviation 'C. P. A.' or similar letters of designation to deceive the public into believing that the person so acting is a certified public accountant under the law, without first undergoing the examination by the state board of accountants as required by said statute, and otherwise complying therewith. In other words, any one is at liberty to practice as an accountant, notwithstanding this law, so long as he does not represent himself to be a certified public accountant, as defined thereby, or use the abbreviation 'C. P. A.' or similar letters or device to indicate that he is a certified public accountant."

Further in the opinion the court said:

"We think, therefore, that the Legislature, in the public interest and for the general welfare, unquestionably had and has the power to regulate the highly skilled and technical profession of public accounting in the measure which it did"

—and this was quoted in the New York case and in the Texas case.

In People v. Marlowe, 203 N. Y. Supp. 474, in the first paragraph of the syllabus it is said:

"General Business Law, par. 80, prohibiting the use of the degree or title of 'Certified Public Accountant,' or 'C. P. A.' and making such use by a person who has not obtained a certificate from the Board of

Regents of the University a crime, is legislation 'in the public interest and for the general welfare,' and is properly within the police power of the state, in view of the fact that public accountancy is a well-recognized profession, and that the practice thereof is not made dependent on the issuance of any license or special qualification, but the statute only prohibits the use of the title or degree without the certificate of the regents."

In the case of Henry v. State of Texas, 97 Tex. Cr. 67, the Court of Criminal Appeals of that state held the act valid. Henry was being prosecuted for holding himself out to the public as a holder of the degree of Certified Public Accountant, using the initials "C. P. A.", and sought to justify upon the grounds that that degree had been conferred and certificate issued by the National Association of Public Accountants, and the invalidity of the Texas statute. In holding the act within the legislative power of the state the court said:

"Note is to be taken of the fact that the law does not inhibit the appellant or others s'milarly situated from pursuing the occupation or vocation of a public accountant in the state of Texas, but the act inhibited is that of holding out to the public that he holds a certificate issued in compliance with the statute of this state by using in his advertisements the term 'Certified Public Accountant' or the initials 'C. P. A.' "

It will be observed that in all these cases the courts went no further than to say that the Legislature had the right to regulate this profession to the extent it did.

The question here for consideration, as far as we know, has never before been submitted to an appellate court. While many opinions have been written upon the right and power of the state to regulate the different trades, businesses, and professions, no analogous case has been called to our attention. The cited cases holding that trades and professions are within the right of the state to regulate by legislative enactment, to the extent here attempted, are not analogous for two reasons. In the first place, such cases have to do with trades and professions which touch and affect all the people generally of the state or community, while the profession of accountancy touches and affects a particular class only, that of people engaged in business enterprises requiring the services of accountants as hereafter more fully pointed out. In the second place, the trades and professions so regulated are of such nature that the result of the services rendered cannot always be definitely known or determined, but reliance must be had upon the knowledge and skill

of the one performing the service. The accountant has to do with what is recognized as an exact science. The correctness or incorrectness of the conclusion reached is subject to proof or disproof to the exactness of an absolute demonstration. We, therefore, deem it unnecessary to review all the authorities cited by counsel in their briefs. The applicable law, as has often been said, is within the general learning of courts and lawyers. The general principles upon which the police power of the state rests, and the purposes of its exercise, are clearly stated in two paragraphs of Corpus Juris, cited in the plaintiff's brief. In 12 Corpus Juris 907, it is said:

"The police power is an attribute of sovereignty and exists without any reservation in the Constitution, being founded on the duty of the state to protect its citizens and provide for the safety and good order of society. It corresponds to the right of self-preservation in the individual, and is an essential element in all orderly governments, because necessary to the proper maintenance of the government and the general welfare of the community. On it depends the security of social order, the life and health of the citizen, the comfort of an existence in a thickly populated community, the enjoyment of private and social life, and the beneficial use of property. And it has been said to be the very foundation on which our social system rests. It has for its object the improvement of social and economic conditions affecting the community at large and collectively with a view of bringing about 'the greatest good of the greatest number.' "

And in section 416:

"It has been found impossible to frame, and is indeed deemed inadvisable to attempt to frame, any definition of the police power which shall absolutely indicate its limits by including everything to which it may extend and excluding everything to which it cannot extend, the courts considering it better to decide as each case arises whether the police power extends thereto, the power being coextensive with the necessities of the case and the safeguards of the public interest. Notwithstanding the impossibility of exact definition of the scope of the police power, numerous efforts have been made to define its scope in a general way. It has been said that the scope of the police power is the broadest in scope of any field of governmental activity. It extends to all matters which concern the regulation and control of the internal affairs of the state, and almost the whole of the great body of municipal law which establishes and enforces the duties of citizens to each other is embraced within and known as the police power. It has been said that the police power is not a fixed quantity and that it changes from time to time to meet changed

conditions of society. It is more accurate to say, however, that the power itself remains the same, and that its apparent extension is only the application of the principle on which it is based to new conditions as they arise."

In Chicago, Rock Island & Pacific Ry. Co. v. State, 23 Okla. 105, 99 Pac. 905, Justice Kane used this language:

"The police power of a state is exclusively for the protection of the public welfare, and, cannot be fairly invoked except to promote the public convenience, the general prosperity, the public health, the public morals, or the public safety."

In the recently decided case. In re Application of A. L. Tindall for Writ of Habeas Corpus, 102 Okla. 192, 229 Pac. 125, Justice Harrison said:

"The police power is an attribute of sovereignty, inherent in every sovereign state, and not derived from any written Constitution, nor vested by grant of any superior power.

"The term 'police power,' comprehends the power to make and enforce all wholesome and reasonable laws and regulations necessary to the maintenance. upbuilding and advancement of the public weal, and protection of the public interests.

"It is plastic in its nature and will expand to meet the actual requirements of an advancing civilization and adjust itself to the necessities of moral, sanitary. economic. and p litical conditions.

"No principle in our system of government will limit the right of government to respond to public needs and protect the public welfare."

In Allgeyer v. Louisiana, 165 U. S. 578, the following language of Justice Bradley in Butcher's Union S. H. & L. S. L. Co. v. Crescent City L. S. L. & S. H. Co., 111 U. S. 746, was quoted with approval:

"The right to follow any of the common occupations of life is an inalienable right. It was formulated as such under the phrase, 'pursuit of happiness,' in the Declaration of Independence, which commenced with the fundamental proposition that 'All men are created equal; that they are endowed by their Creator with certain inalienable rights; that among these are life, liberty, and the pursuit of happiness.'"

To this has been added, by the Bill of Rights of this state. "and the enjoyment of the gains of their own industry." When these words from the Declaration of Independence were quoted in the Bill of Rights with the added words. "and the enjoyment of the gains of their own industry," it was for the purpose of stressing the inherent right of the individual as against unnecessary encroachment upon those rights by the state.

It is necessary, in order to reach a satisfactory conclusion, to consider, first, the nature of the services rendered by a professional or expert accountant, and, second, the effect of the restrictions, here questioned, upon the right to follow that profession upon (a) the certified accountant, (b) the uncertified accountant, (c) those whose businesses require the employment of accountants, and (d) the relation of such service to and its effect upon the general welfare.

Counsel agree that Robert H. Montgomery is an authority upon the subject of accountancy. That author points out the duties and purposes of an auditor in this language:

"In what might be called the formative days of auditing students were taught that the chief objects of an audit were: 1. The detection. or prevention of fraud. 2. The detection or prevention of errors but in recent years there has been a decided change in the demand and in the service. That is to say, the financiers and business men who originally retained professional auditors to look for fraud or errors have enlarged their demands and now require a vastly broader and more important class of work, which those auditors who have advanced in skill and knowledge have been able to understand and perform. We must therefore relegate the former 'chief objects' to a subordinate position without in any way depreciating their importance.

"The relative position of the present-day purposes are:

"1. To ascertain the actual financial condition and earnings of an enterprise for:

"(a) Its proprietors (partners or stockholders).

"(b) Its executives (managers, officers, or directors).

"(c) Bankers or investors who are considering the purchase of securities.

"(d) Bankers who are considering the discounting or purchasing of its promissory notes.

"2. The detection of fraud or errors as explained in later chapters of this book.

"The results secured by auditors are required for the following, among other purposes:

"(a) In order that stock and bond holders or other owners may have submitted to them at regular intervals a comprehensive, even though a condensed, statement of the financial position and the net results of the operations of the business in which they have a proprietary interest. and that the fairness and accuracy in all essential particulars of the statement submitted may be

attested by means of a certificate or report of a disinterested and competent authority.

"(b) Upon a proposed sale or incorporation or other change in form or management, such as an attempt to bring in additional capital, or the death of a partner or large stockholder. Matters of the highest importance arise in connection with the interests of partners in the event of death or other change in the partnership relations.

"(c) To submit similar statements in more detail to banks and note brokers as a basis of credit.

"(d) To submit certified statements to the mercantile agencies and to other organizations which call for periodical reports.

"(e) To ascertain the true causes of fluctuations in profits or expenses.

"(f) To state the facts in disputes or litigation, and to investigate the causes of bankruptcy for creditors or stockholders."

As the laws of the various states are of similar character and purpose, and much like our own law, with the exception noted, we deem it not improper to call attention to the general history and circumstances of their adoption as gathered from the briefs and oral arguments and from the, adjudicated cases of New York and the District of Columbia. It appears that for a number of years the National Association of Public Accountants, incorporated under the laws of the District of Columbia, in promoting the interest of public accountants and members of that association particularly, have held examinations of applicants to membership, and conferred degrees on those standing a satisfactory examination, and have issued certificaes of qualification to practice as public and professional accountants. Those certificates have been considered of value as showing, or persuading the public to believe, that the holder was in every way qualified to practice that profession in a satisfactory way. A number of years ago the accountants began to appeal to the Legislatures of the different states to authorize by law similar degrees to be conferred upon accountants, as the result of which, as has been said, every state in the Union now has a law authorizing some board to confer degrees upon those standing a satisfactory examination, and to issue certificates certifying their qualifications to practice as professional accountants. These certificates are recognized as of value to those holding them, and, in a sense, may be said to be a substitute for a well earned reputation acquired by giving satisfactory services by an expert accountant to those engaging his services. Those holding a certificate appear to be recognized as having some advantage in the profession over those not holding such certificate.

It may also be observed that this character of legislation has been brought about by the activities and influence of members of that profession and not by any public demand or any activity on the part of that part of the public whose business requires the employment of accountants. In other words, the legislation has been brought about by the interests of public accountants for those engaged in the profession and for their interests rather than for the public welfare.

As throwing light upon the purposes of the enactment of the prohibitive sections, 11 and 14, we excerpt the following statement from the preliminary statement contained in the brief of the plaintiff:

"*** It has been the contention of a number of the accountants of the state that that statute is unconstitutional, on the ground that the business of public accounting is not such a business as comes within the scope of regulatory police power, particularly where the practitioners do not practice on behalf of the state or its municipal subdivisions. The results have been that the State Board of Accountancy has been hampered in the enforcement of this statute; that those accountants who have thought the act unconstitutional, and have refused to abide by it, have found themselves laboring under disadvantage; and that those accountants who have taken a position behind the enforcement of the statute and have complied with it have found themselves at the unfair advantage of undergoing competition from those who have not gone to the trouble and effort of complying with the statute."

Reference to this statement is had, not in a spirit of adverse criticism, but rather in commendation of the full and frank statement made by the Attorney General. We think in making this frank statement to the court the Attorney General was performing one of the highest duties of the representative of the state, that of giving the court the fullest information obtainable to aid in reaching a correct conclusion. We quote again that part of the statement which particularly points out one of the reasons for this action and we think for the enactment of the prohibitive sections themselves:

"*** And that those accountants who have taken a position behind the enforcement of the statute and have complied with it have found themselves at the unfair advantage of undergoing competition from those who have not gone to the trouble and effort of complying with the statute."

Under the laws of the other states, held to be valid, and under our law, with sections 11 and 14 omitted, the only advantage conferred upon certified accountants is

that of having their qualifications ascertained, a degree conferred, and a certificate issued by a board created by law for that purpose. These findings of the board are recognized as an inducement to those desiring an audit to employ an accountant from the certified list, but, by sections 11, and 14, the business must come to them without outside competition, either as to qualifications or compensation demanded.

The effect upon the uncertified accountant is definite and certain. Whether it is because he stands on his belief that the act is void, and elects to stand on what he believes to be his constitutionally guaranteed rights, or because he is unable to stand the examination, or is not a citizen of the United States, or does not enjoy the reputation of a good moral character, or has had his certificate revoked because of being convicted of a felony, or found guilty of conduct involving moral turpitude, or having certified to false or fraudulent statements in relation to an audit, or fraud or misrepresentation in application for the certificate, the result is the same; that after he has devoted time, effort, and expense to equip himself as an expert accountant, he is prohibited from following that calling, and those dependent upon him are deprived of the fruits of that training and investment, and he is forced to seek other employment where that investment and training are of no avail for their support.

As to those engaged in business enterprises desiring the services of an accountant, it limits them to employment from the certified list regardless of the purposes of the audit, the degree of skill deemed necessary to perform the service required, whether less or greater than that presumed to be possessed by the holder of the certificate, and regardless of the compensation demanded, and regardless of the fact that the services are to be rendered under contract in matters usually considered of private concern.

It must be conceded that the work of expert accountants in some degree affects the general material welfare. No one is wise enough to define the limits of influence. The public health, morals, or intelligence of the state is but the composite of the morals, health, or intelligence of the individuals composing the state. Likewise the material well being of the state is but the sum of the well being of the individuals composing it. The business of the state is made up of the individual businesses within the state. A business success or a business failure, therefore, in some degree, affects the material welfare of the state or the community. But in what manner does the work of an accountant affect the public welfare when considered in connection with auditing for private individuals, firms, and corporations engaged in what is generally known as private business? The effect upon the public welfare can be determined only by the effect had upon the business or enterprise being audited. If that audit, by reason of the skill and technical knowledge of the accountant, proves of value to the business or enterprise, then it may be said that the general welfare has been affected advantageously in some slight degree by the audit. If the audit, by reason of the want of skill and knowledge upon the part of the accountant, proves to be of no value, or of detriment to the business or enterprise, then to that extent is the general public welfare affected to its detriment. It can only be by the effect produced upon the private business or enterprise for good or bad that the public welfare can be affected by the auditor, as such, to any perceptible degree. It is, therefore, upon the principle that the private business welfare of individuals, firms, and corporations, other than the auditor, so affects the general welfare by success or failure as to render it necessary or desirable to regulate the business of accountancy, that these sections complained of were enacted. When it is declared by law that private business concerns, in the employment of an accountant or auditor when deemed by them to be of advantage or to their interest, must, in the interest of the general welfare, employ one certified by the state, it is for the reason that such private business so affects the general welfare as to render it to the best interest of the public that their right of contract be limited in the employment of an accountant. It is, in effect, a regulation of private business concerns desiring an audit. An application of the same principle with the same results would justify legislation requiring private business concerns to submit to an audit, or to require them to have an audit made at stated times or under certain conditions. It would be the application of the same principle with the same results, differing only in degree. There are certain corporations known as public service corporations which, in the interest of the general welfare, the federal and state governments have deemed it necessary to regulate by requiring them to submit to audits and make reports, but they have never gone so far as to say whom they shall or whom they shall not employ in matters of private concern. They have been left free to exercise their own judgment in selecting their employes,

and no restrictions have been placed upon the right of anyone to accept such employment. Heretofore private enterprises, including those classed as public service corporations, have been permitted to contract in matters affecting their private concern without any serious thought that such business, however small or extensive, sufficiently affected the public welfare as to justify depriving them of that right. American constitutional governments rest upon the right of private property. By private property is meant the right of absolute control of property. It includes the right of contract in matters concerning that property. It is true that the right of private property and the right of private contract must yield when the public peace, health, safety, or general welfare renders it necessary, but no court has ever held, so far as we know, that reputable business enterprises, innocent in their nature, so affect the public welfare by success or failure as to justify their regulation to the extent of limiting them in their right to contract in matters purely of private concern.

But, considered as affecting accountants only, what of the validity of these sections in question? What, in the light of the history of this class of legislation, as above pointed out, was the purpose of its enactment and what its effect? The legislation has been brought about by the activity of accountants. The president of the National Association of Public Accountants testified before a committee of Congress where similar legislation was sought in the District of Columnbia, that he had devoted 25 years to securing such legislation in the various states. It is conceivable that men engaged in a private pursuit for gain might ask for legislation regulating them in the interest of the general welfare, but human nature is such, and experience is such, that it cannot be expected. While it is not conceivable that it was the legislative intent to confer upon certified accountants the advantage given by sections 11 and 14 by denying to business concerns the right of contract in matters of private concern, and without any compensating advantage to the public welfare, such appears to be the effect of their enactment if they be held valid.

Who can say that it is in the interest of the general welfare that a private business enterprise be denied the right to contract for the audit of its business, or that an accountant be denied the right to contract to make such audit, simply because the accountant is not qualified, or has not had a degree conferred upon him, or is not a citizen of the United States, or has been con-

victed of a felony, or on another occasion has made a false certificate to an audit? Who can say that the general welfare would be enhanced, in any degree, by diverting all accountants who may not possess that degree of efficiency, or moral character, required by the statutes. into other lines of employment? If so, what character of employment may they accept? No one would be bold enough to say that it would be for the general welfare to deny the right of any person, firm, or corporation engaged in what is generally known as a private business enterprise, to contract in matters of their own private concern, for the services of one with an unsavory or even a criminal record, or to deny to such a one the right to contract to deliver his services.

The distinction between this act, including sections 11 and 14, and the laws regulating accountancy, held to be within the police power of the state and valid, is broad and clear. The distinction is that in the one case the law says to those desiring an audit, "Here is a list of qualified accountants from which you may or may not select as in your judgment better serves your purpose." while in the other it says, "You shall employ no other." In those states, and in this state, excluding sections 11 and 14, a degree is conferred and a certificate of competency and good moral character issued. The certificate is of value to the holder. By that certificate the state says to those people desiring an audit, "these men are qualified," but the law leaves free those engaged in private enterprises the right to employ any other, and leaves accountants not certified the right to accept the employment. Here, by sections 11 and 14, the state says to the business man: "If you have an audit it must be by a certified accountant. Your right of contract matters heretofore considered to be of your own personal concern must therefore be limited. "To the uncertified accountant it says, "You must adopt some other calling regardless of the circumstances or misfortune which may have prevented your holding a degree." While the other states have deemed it a sufficient regulation to furnish a list of accountants found to be capable from which those desiring an audit may or may not select, by sections 11 and 14 this state has said, "You shall contract with no other regardless of the purpose of the audit." And why? There is no suggestion that there has ever been any demand for such regulation by anyone other than accountants. The effect of the act is that in a growing, expanding. and lucrative field of usefulness of accountants. power is given a board in which accountants have control to restrict

their number, and tends toward a monopoly. It deprives those desiring an audit the right of contract in matters purely of private concern, and deprives accountants not certified of the enjoyment of the gains of their own industry guaranteed to them by the Bill of Rights, in that it denies to them the right to follow the occupation for which they have qualified themselves by the expenditure of time and toil.

There may yet be found some system more serviceable to the general welfare than the right of private property and the right of private contract, and, if so, it is the unquestioned right of the people to adopt such system, but it must be done by change in the fundamental law. That right is fixed by the Constitution of the United States and of this state. The change, if brought about, must be be brought about by change of the Constitutions. It is not within the power of a Legislature under our constitutional government.

Our conclusion, therefore, is that the act, insofar as it prohibits uncertified accountants from holding themselves out as professional or expert accountants or auditors for compensation or engaging in the practice of that profession, is in conflict with the spirit and express provision of the Constitution and void, in this, that it abridges the right of private property and infringes upon the right of contract in matters purely of private concern, bearing no perceptible relation to the general or public welfare, and thereby tends to create a monopoly in the profession of accountancy for the benefit of certified accountants, and denies to uncertified accountants the equal protection of the laws, and the enjoyment of the gains of their own industry. The defendants are not engaged in the exercise of a franchise, but a constitutionally guaranteed right. The trial court, in effect, so held and the judgment should be affirmed.

By the Court: It is so ordered.